I'm James Laughlin, I represent the appellant Clive Bowen, and with the court's permission I'd like to reserve two minutes of my time. If the court has any particular issues it wants me to address, please let me know. Otherwise, I plan to discuss three related trial issues that also impact the loss miscalculation issue. Second, we are allowing the bank investigator Ms. Bonucciaro and the postal investigator Mr. Claiborne to improperly testify about lay testimony, identifying the defendant in photographs, giving a dual rule instruction that improperly labeled that as expert testimony, and improperly admitting Bonucciaro's spreadsheets as subjective results for investigation as business records. In fact, this court recognized that lay witness testimony on identifying a person in a photo is only appropriate if that witness has independent sufficient contact with the person to achieve a level of familiarity making the opinion helpful. The government has not pointed to any cases that said that familiarity can be itself developed through this group of photos. On the contrary, we've cited case law from this court and other circuits that have held that it's improper for a witness to act in effect as a 13th juror. So let me ask you this, so the jury didn't get to look at the video because the video's destroyed what, 90 days later? Correct. Is that what, if they had retained the video, obviously, and they had played the video, the jury could look for it for itself, right? Correct. See whether it looks like it's your client, and the clothes your client was wearing, and the car, and all of those type of things. So that's the reason it happened, right? Well, yes, Your Honor, and that raises a good point, because that's the government's trying to say that this doesn't fall into the 13th juror scenario because Ms. Bonucciaro, which, again, this argument doesn't apply to the Postal Inspector Claiborne, who only saw the still photos that were available to the jury, I believe. But the problem with that argument is, and this kind of goes back into the, related to the dual role instruction thing, is the government's really improperly combining lay and expert testimony. First of all, those videos were destroyed after the defendant was charged in this case, which means the government was already involved in this case, and they, too, failed to preserve this key evidence. So to say that we're going to allow this person, who we're not going to even bother trying to qualify as an expert who is some way specially trained to make identification out of videos, look at these videos and came to these conclusions. It's been destroyed, so nobody can check their work, right? The defense can't check the work. The jury can't check the work. The government, I mean, the district court can't check the work. And to say that that's admissible as lay testimony, I think, violates the principles in Beck and with regard to expert testimony, because it's really trying to get in through the back door things that shouldn't be admissible at all, only if somebody goes through the rigorous steps of Dawbert and Rule 702 to actually qualify somebody as an expert whose findings of this kind bear special reliability. And again, that brings us back to the improper dual role instruction, because contrary to what the district court held, that's really only appropriate when at least part of the witness is true expert testimony that's admitted after the requirements of Dawbert and Rule 702 are followed. So it's not just if at some point during the testimony that happens to say, in my experience, you don't give that instruction, because as recognized by this court in Vera, it creates a significant level of confusion with the jury about what is the expert testimony. And here, the court didn't do what the court requires in Vera, which is to say, if you are going to have, when the dual role instruction is appropriate, when there is truly expert testimony as part of the witness's testimony, part of what the district court has to do is clarify for the jury, right, now this witness is testifying as a layperson. Now, from this point forward, they're testifying. And that clearly didn't apply here. Now, related to this, too, is the so-called business records admitted with Judge Financiaro's findings regarding 155 transactions. Again, only eight transactions were charged, and only 30 photos were presented to the jury representing about 11 transactions. But the jury was allowed to see this list of 155 transactions that Financiaro was able to say, trust me, I looked at this, and he's guilty of all of them. Was there an objection? Mr. Bowen did raise an objection to the parts and general retrial motion. When they were in that trial, I believe he did not register an objection as they were coming in. Is that a prime error, then? No, well, I think a couple of things. One, the government doesn't dispute that regardless of whether the Feretta waiver was voluntary, he was not advised as part of the colloquy about preserving records issues for appeal. So I think that that's a reason to not apply a plain error here to the court. Can you cite me a requirement that says that, I mean, I've given Feretta waivers, and I've had a pro se defendant on a special circumstance murder. And I didn't tell him how to reserve errors on appeal. I mean, I went through, I didn't see anywhere in Feretta where it said that. You have to specifically tell them, you know, all the standards and sit through all of that. You just basically have to say you're crazy to represent yourself. You have a full lawyer, and you're not going to get any help and, you know, all of the above. And do you understand all of that? And do you still want to go ahead and say, I don't know where, you know, should the court have jumped in and preserve the objection? Very briefly, what I was trying to make is part of this court has recommended things that should be covered in the colloquy. Council, I'm having difficulty hearing. There seems like a train going by somewhere. Better. That's better. Council, I have a question with respect to the Feretta waiver. What should the judge have done in any event? What additional colloquy was necessary beyond the rather extensive colloquy that's in the record? Well, actually, that goes off of what I was just responding to Judge Callahan's question. This court has recommended certain things that should be covered in a waiver, and that was originally set forth in the French case, and it's repeated in Garretson. And Garretson's case is very similar to this one because the judge missed the same things, and that includes failure to advise the defendant about knowing what an appropriate opening statement is, knowing what appropriate direct and cross-examination is, and knowing what appropriate, what are the appropriate steps to preserve issues for appeal. And those are the things that are missing here. And like I said, in Garretson, the court found that there was no reason to reverse, only because that defendant had actually represented himself at six prior criminal trials, so he was basically nothing that could have been said. He had more experience than a lot of lawyers in terms of jury trials. Correct. Although I would like to talk about the Sunsing trial, I know I'm over time, so I'll sit down if the court doesn't have any other questions. It doesn't appear. I'll give you two minutes on rebuttal. Okay. Thank you. Mr. Chau? Good morning, Your Honors, and please, the court. David Chau on behalf of the United States. The convictions and the sentence for defendant should be affirmed subject to the corrections of three of the conditions of supervised release. I'd like to start by addressing the issues that the court has been addressing, and then if the court has any questions, I'd be happy to follow up on other issues. I'd like to turn first to the question of the admission of the lay testimony by Finacchiaro and Claiborne. The district courts did not plainly err by admitting this testimony. Both witnesses observed the defendant under conditions comparable to and closer in time to the crime in question, and that uniquely positioned them to offer an identification that was helpful to the jury. With respect to Finacchiaro, contrary to what the defense, the appellant has suggested, Ms. Finacchiaro reviewed a large scale of surveillance video and on at least four occasions watched surveillance video of defendant conducting bank transactions on his own account. During those contacts, she was able to see the defendant walk up to the ATMs, drive up to the ATMs, and also under different lighting conditions. And that was valuable to the jury because the surveillance photographs similarly involved those types of variables. In addition to that, Ms. Finacchiaro also saw extensive surveillance video of defendant or the suspect, which she later concluded was the defendant, conducting the fraudulent transactions. And those contacts covered... The usual way you would do it is the jury just gets to let you pick on the case, you say everything that happens, and then you show the jury the video surveillance and they decide whether it's the defendant, not someone else telling them it's the defendant. Yes, Your Honor. In an ideal situation, yes, that would be even better. But I would submit that there was nothing improper with the admission of Ms. Finacchiaro's testimony here. She did have sufficient contact with the defendant based on her own observations. And the appellant says that the government hasn't cited a case, but it's not the government's burden on plain error review to cite clear and controlling authority. It's actually the appellant's burden on plain error review to come forward with clear and controlling case law that says that Ms. Finacchiaro's testimony was based on insufficient contacts as a matter of law. So what exactly did she tell the jury? I looked at the surveillance video and what? Your Honor, she testified to the jury that she looked at both the surveillance video of the suspect committing the fraudulent transactions, and she also viewed surveillance video of the defendant conducting legitimate transactions on his own account. And that based on comparing those surveillance videos, as well as the photographs that were presented to the jury, that she concluded that it appeared to be the same person and that she then informed the postal inspector of that fact. With respect to Inspector Claiborne, Your Honor, I want to clarify one mischaracterization. Inspector Claiborne actually saw the defendant in person, in the flesh, on the day of the controlled delivery in Altadena. Notably, the defendant on that day was wearing the same Rams baseball cap, driving the same car, with the same green shirt in his back seat. And again, that is helpful to the jury because those are the factors that they would have to have looked at for the surveillance photos as well. So, on top of that, Inspector Claiborne also not only arrested the defendant, but also transported him and then conducted a post-arrest interview with him at the inspector's office. And the site for that is ER 312, 313, 662, 663, as well as CR1, which is the criminal complaint that was filed in the district court. And all of that suggests that this whole process took at least eight hours. And so the appellant's contention that Inspector Claiborne didn't have or had some kind of fleeting encounter with the defendant is simply incorrect. Well, did he admit to her that he did all of this in the eight hours they had together? The defendant did not confess to the crime during those eight hours, Your Honor. Where did they find it at the defendant's house? At the defendant's house, Your Honor, they found the two stolen debit cards in the name of the victim identified in count one of the indictment. And they also found separate wads of cash totaling approximately $3,300. And they also found receipts suggesting large purchases. They also found, of course, evidence confirming that it was, in fact, the defendant's residence. And that leads to the second point I was going to make, Your Honor, which is that... One of the receipts was $1,500 to Barney's for shoes or something? That's correct, Your Honor. That is what the receipt reflected. And that was found in the same room that other evidence of defendants lived in that room. Which leads me to the other point, Your Honor, which is that even if this court were to conclude that there was some error in terms of the lay testimony, this court has a fair assurance that that did not materially affect the verdict because of two things. First of all, the record shows the jury exercised its independent judgment with respect to identifying defendant as the culprit. First of all, the jury sent a note specifically asking for photos of the defendant conducting business on his account. And then within three hours of receiving the answer to that note, the jury returned its verdict, and it returned a split verdict. It convicted on five counts, and then it hung or acquitted on three counts. And by defendant's own admission, the three counts on which the jury hung or acquitted were the counts in which the surveillance photographs depicted the face of the suspect being blurry or obstructed. And so what that tells this court is that the jury took it upon itself to look at the photos of the defendant and compare them to the surveillance photographs and ultimately made its own decision as to whether or not to defer to Claiborne or Finacchiaro's testimony. The second reason there's no prejudice is because the jury didn't really need to rely on Claiborne or Finacchiaro's testimony because there was ample other evidence to support the verdicts. Again, defendant was the one who showed up at the controlled delivery in Altadena, scoping out the house where the mail was supposed to arrive. And it was the defendant's apartment where the authorities found the two stolen debit cards, as Judge Callahan referred to. Can I ask you about the spreadsheet? I wanted to know what your response was to the reply brief's distinguishing of the U-Haul case on the grounds that Finacchiaro's preparation of the spreadsheet involved a subjective sifting of the data that distinguishes that case. What's your response to that? My response, Your Honor, is that that's no different from what happened in U-Haul. In the U-Haul case, it was an insurance dispute between the insured party and an excess insurer. And the three records that were admitted as business records in that case were essentially printouts of summaries of the insurance claims that were in dispute. And what happened in that case was that U-Haul, or the insured party, asked the claims manager to print out the losses to detail the transactions that they thought that the plaintiff believed were the losses that were at issue. And so I would submit, Your Honor, that U-Haul... First of all, U-Haul says that printouts from a compiled database for the purpose of litigation are acceptable as long as the compiled database was recorded and kept in the ordinary course of business. But going back to the facts in U-Haul, in that case, the claims manager must have made some subjective... some subjective process in reducing a large, massive database down to a printout for litigation. And I would submit, Your Honor, that in any case where there's a printout for litigation, there necessarily needs to be some sort of subjective culling. Otherwise, there is no way to reduce a massive database to a printout. So I would submit, Your Honor, that U-Haul still governs the court's analysis in this case and that U-Haul teaches that as long as the underlying database was recorded and kept in the ordinary course of business, then the printouts from that database are similarly admissible as business records. And just to... What was the objection that was made? Your Honor, there was no objection lodged at the time of trial. And with respect to the pretrial motions, defendant filed a motion arguing against the record on some relevance grounds but not as to... but did not oppose them on the 803 grounds or the 902 grounds. And so... And as a matter of fact, the district court never actually definitively ruled on those pretrial motions. And so the government's position is that for both those reasons, this issue was not preserved and it should be reviewed for plain error. Even if this court were to find that there was some error with respect to the business records, again, the government in our papers argued that any error was harmless because the spreadsheet was cumulative of the other evidence in this case. Pinocchio, combined with the bank statements, combined with the surveillance photographs, combined with the other evidence in this case, are more than sufficient for the jury to reach the same conclusion. I see that I am out of time, so... Counsel, I have a question if I may ask. Do you concede that we should remand with respect to the supervised release conditions? Because of the difference between the oral statement and the written provisions? I do not, Your Honor. I respectfully disagree with my colleague's reading of the PED case. The PED case was a situation of vagueness where this court would have had to essentially rewrite the terms. And in that situation, I would agree that a remand is appropriate. However, in this case, the differences that the government conceded in its papers, the differences can be easily remedied by simply striking language. And in that situation, it's proper for this court to simply strike that language from those conditions, Your Honor. Is it up to us to strike the language, or do we have to remand for the district court to do that? Your Honor, my understanding under the Napier case and other cases cited in our papers is that that act of striking could be done by this panel. But you agree that there's some discrepancy between the oral and the written? I do, Your Honor. That was as to three conditions, right? Correct. I think it was conditions three, four, and six, Your Honor. Okay. Unless... Yes. Any additional questions by my colleagues? Anything else? Okay. Thank you, Mr. Chau. Thank you, Your Honor. All right. Mr. Laughlin, you have two minutes for rebuttal. Thank you. The government's argument with regard to the lay testimony of Ms. Funuciaro I think is really significant because what it basically said... What it basically wants the court to hold is that you can get around back as long as you have a so-called lay witness testify about photo comparisons and then destroy the photos or then destroy the videos. And I just don't think that that's a wise or permissible holding in regards to the way that this court deals with lay testimony or expert testimony. Certainly, if an expert had tried to do this and said, well, I can't give you my underlying data that I used for my expert opinion because I destroyed it, it would never get past a Daubert hearing. Why don't you respond to the fact that the jury just didn't convict your client on everything, that the jury did seem to exercise some independent judgment here? Well, I actually think that helps us. I think the fact that they struggled with the identity issue and did not convict on all counts helps because what that tells us is that all this improper testimony put a thumb on the scale, on the reasonable doubt scale, in the government's favor. So any borderline issues of identity, the government got the benefit of the doubt by having, A, improper lay testimony, B, having that improperly labeled as expert, and C, having these other 150 transactions come in on only the say-so of Ms. Linociaro. I see that I'm out of time, so I'll support that for the other questions. Counsel, I have a question. With respect to the supervised release, you heard opposing counsel. Do we have the power to make those deletions here, or should we remand for the district court to do it? I think the court should remand it. I disagree with the government's reading of PED. As I read PED, the holding was, this is not something we do as appellate judges. This is the district court's job. Once we identify the problem with these supervised release conditions, it really should go back to them. Are you familiar with the Hicks case? Hicks? I don't believe. That circuit case? I don't believe. That's fine. That's fine. All right. Thank you both for your argument. This matter will stand submitted, and this court will be in recess until tomorrow at 9 a.m. Thank you, Your Honor. Thank you.
judges: O'scannlain, Callahan, Collins